# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information about the location of the cellular telephone assigned cell number **(949) 299-6039**, fully described in Attachment A

)
)
)  Case No. 19-MJ-1254
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Information about the location of the cellular telephone assigned cell number **(949) 299-6039**, fully described in Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956 and 1957

The application is based on these facts: See attached affidavit.

☒ Delayed notice of _____ days (give exact ending date if more than 30 days: 1/15/20|2|0) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bradley Isaacson, DEA Task Force Officer
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 6/6/19

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Bradley Isaacson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned cell number **(949) 299-6039**, ("**Target Cell Phone B**"), whose cell phone provider is **AT&T**, a wireless telephone service provider headquartered in Dallas, Texas. **Target Cell Phone B** is described herein, and in Attachment A, and the location information to be seized is described herein, and in Attachment B.

2. I am employed as a Detective with the Wauwatosa Police Department and have been a law enforcement officer for over 14 years. I have been a Detective for over 5 years and have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 3 years. I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since March, 2015. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have

1

participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

- a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

- b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

- c. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

- d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

- e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

- f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

- g. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

- h. I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

- i. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

- j. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4. I am currently participating in an investigation of a fentanyl, methamphetamine, and marijuana trafficking organization led by Jonnie LOPEZ, hereinafter referred to as the LOPEZ DTO. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (c) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.[1] This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956 and 1957, have been committed, are being committed, and will be committed by an Jonnie LOPEZ, Pedro MENDOZA, and others not yet identified. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

---

[1] Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

3

## PROBABLE CAUSE

6. During March 2018, a confidential source herein referred to "CS-1"[2] was interviewed and provided information about a heroin dealer by the name of Johnny GLOVER. CS-1 was shown a Wisconsin DOT photograph of Johnny C. GLOVER (m/b 04-26-80)[3] and positively identified the person as Johnny GLOVER (here in referred to GLOVER). Over the course of the next three months, North Central HIDTA and the DEA conducted three (3) controlled purchases of heroin, cocaine, and fentanyl from GLOVER.

7. On August 21, 2018 case agents conducted two search warrants and arrested GLOVER. Case agents recovered heroin, cocaine and a firearm during the arrest of GLOVER. A recorded and mirandized interview of GLOVER was conducted at the Greenfield Police Department by TFO Busche. GLOVER provided specific information about the drug trafficking activities of his source of supple, who he identified as Jonnie LOPEZ. A Wisconsin DOT photograph of Johnnie D. LOPEZ (m/w 06-12-85) was shown to GLOVER who positively identified Johnnie D. LOPEZ (m/w 06-12-85) his heroin and cocaine supplier.

8. GLOVER further stated during one purchase of narcotics he conducted with LOPEZ the narcotics were delivered by LOPEZ's half-sister, Samantha WEBSTER. A

---

[2] Case agents believe the CS-1 is a reliable person because the CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, the CS-1 has provided statements against the CS-1's own penal interests, and the CS-1 has conducted controlled buys of narcotics for law enforcement.

[3] GLVOER has prior arrests for Delivery of Heroin, Delivery of a Schedule II Narcotic, Operating while Revoked, Operating While Under the Influence, Possession with the Intent to Deliver Cocaine, Possession with Intent to Deliver Marijuana, Bail Jumping, Resisting and Obstructing an Officer, First Degree Reckless Endanger Safety, Possession of THC, Maintaining a Drug Tracking Place, Contributing to the Delinquency of a Child, Using a Child to Distribute Narcotics, Failure to Appear, and Loitering or Prowling.

4

photograph of Samantha WEBSTER (f/w 06-13-90)[4] was shown to GLOVER and GLOVER positively identified WEBSTER as LOPEZ's half-sister. GLOVER indicated he has known LOPEZ for over 10 years and was aware LOPEZ's family is involved in assisting him in the distribution of heroin in the Milwaukee area. GLOVER is currently released from custody ($20,000 signature bond) and has since been charged in Milwaukee County Circuit Court, 2019CF001253, with Manufacturing and Delivery of Cocaine, Manufacturing and Delivery of Cocaine. Manufacturing and Delivery of Cocaine. Manufacturing and Delivery of Schedule II narcotic, and Manufacturing and Delivery of Heroin.

9. Case agents started an investigating into the LOPEZ DTO for the sale and distribution of heroin in August of 2018. Case agent were able to positively identify members of the LOPEZ DTO through phone tolls analysis, surveillance, controlled deliveries of narcotics and surveillance of LOPEZ.

10. On November 2nd, 2018 in the City of Cudahy at 5529 S. Illinois Avenue, Cudahy WI 53110 squads responded for a report of a heroin overdose (City of Cudahy Police Department case 18-001987). It was believed Brian KESSLER died as a result of ingesting heroin obtained from Tina HERMANN. On 12-12-18, Milwaukee Medical Examiner report was received. The report indicated KESSLER died of an "acute mixed ethanol and heroin toxicity". HERMANN was arrested and provided information that the fatal heroin HERMANN provided to the victim was obtained directly from Jonnie LOPEZ (25 grams). The Milwaukee County District Attorney is currently reviewing charges for Reckless Homicide against LOPEZ. HERMANN is currently in custody at the Milwaukee County Criminal Justice Facility and has been charged for

---

[4] WEBSTER has prior arrests for Aggravated Battery/Intent Great Bodily Harm, Disorderly Conduct, Criminal Damage to Property, Battery, and Possession of Marijuana.

5

Manufacturing and Delivery of Heroin (PTAC) and Possess with the Intent to Deliver Heroin (PTAC), Milwaukee County Circuit Court Case Number 2019CF005296.

11. On Tuesday, April 25, 2019, case agents met with a confidential source, here in after referred to as "CS-2."[5] CS-2 provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area. CS-2 identified Jonnie LOPEZ aka "Jonnie" and "J-Money" as a large-scale distributor of heroin, cocaine, methamphetamine and marijuana in the greater Milwaukee area. CS-2 stated "Jonnie" is a Hispanic male, approximately 5'8", 150 lbs., 33-35 years old, and lives at a residence (duplex) on E. Windsor place in the City of Milwaukee. Investigators identified "Jonnie's" residence as 1817 E. Windsor Place. CS-2 stated he/she has known "Jonnie" for approximately six months and has conducted drug/money transactions from "Jonnie" in the past. CS-2 stated "Jonnie" drives a black Jeep Wrangler, and a grey Chrysler sedan.

12. CS-2 further stated on or around the first week of April, CS-2 was at "Jonnie's" residence (1817 E. Windsor Place, Milwaukee, WI), and observed a large quantity of heroin, cocaine, and methamphetamine. CS-2 believes "Jonnie" deals directly with a yet unknown source of supply in Mexico. CS-2 stated "Jonnie" sends money down to Mexico, which covers transportation costs, as well as the quantity of narcotics being transported.

13. During the week of April 29, 2019, CS-2 was in telephonic contact with "Jonnie". CS-2 stated at this time, "Jonnie" said he was expecting a big load (of narcotics) in the next week or so. CS-2 estimates that "Jonnie" was referring to kilogram quantities of cocaine, and/or heroin,

---

[5] Case agents believe the CS-2 is a reliable person because the CS-2 has provided information which law enforcement has been able to corroborate through independent investigations, the CS-2 has provided statements against the CS-2's own penal interests, and the CS-2 has conducted controlled buys of narcotics for law enforcement.

6

and methamphetamine. CS-2 provided two telephone numbers for "Jonnie"; (414) 306-2769, and (414) 241-4274.

14. On May 2nd, 2019, CS-2 was shown a Wisconsin DOT photograph Johnnie D. LOPEZ (m/w 06-12-85) and positively identified Johnnie D. LOPEZ (m/w 06-12-85) as the heroin, cocaine, methamphetamine and marijuana dealer CS-2 knows at "Johnnie".

15. Case agents conducted a records check through NCIC of Johnnie LOPEZ, which showed LOPEZ is currently on Federal Probation for the Sale and Distribution of Marijuana in Eastern District of Wisconsin, DEA case I3-11-0051 (Sentenced 60 months, 3 years supervised release).

16. In the end of May 2019, CS-2 was interviewed and provided additional information about LOPEZ. CS-2 recorded a conversation CS-2 had with LOPEZ. LOPEZ informed CS-2, "they got here. Chino got some." LOPEZ told CS-2 altogether I have 52 of water." (TFO Busche clarified with the CS-2 that 'water' is a term used about Methamphetamine). LOPEZ further clarified and said he had "10 here right now." LOPEZ told CS-2 while "Pedro" was "here talking to me, his dad called and said he had 42 more" for LOPEZ. LOPEZ said once the "10" are gone "he" (Pedro) would transport "the Chinatown" and the "42" back.

17. LOPEZ told CS-2 that LOPEZ was "getting them for 3." (Case agents believed this to mean LOPEZ was paying $3000 for 1 pound of the crystal methamphetamine). LOPEZ told CS-2 he was hoping to get a cut in the price of the crystal methamphetamine once he was done with the CS-2 10 pounds and was going to get the 42 pounds of methamphetamine. LOPEZ told CS-2 the "42 pounds" of crystal methamphetamine was going to be "coming the same time with the food." LOPEZ told CS-2 it "was already across the border. It's already there so it's for sure. 100% locked in already." LOPEZ said "he (who case agents believed was "Pedro") has to go back

7

and then he's going to grab everything and come right back." LOPEZ reiterated to CS-2 the "10" needed to be sold first.

18. LOPEZ told CS-2 "Chino" has "10" (case agents believed this to indicate "Chino" was holding onto the 10 pounds of crystal methamphetamine LOPEZ received from "Pedro").

19. LOPEZ said the next time "Pedro was here, he is going to bring me one 'girl' (which case agents believed to be one kilogram of cocaine) and if we like it he's going to get us 10 more right away. And we will be getting the girl for 29 ($29,000)."

20. Later in the conversation, LOPEZ told CS-2 his connect (which case agents know to be a slang term about a narcotic distributor's source of supply) uncle was going to purchase a vehicle from "Chino."

21. LOPEZ then told CS-2 he was to receive "10 of the chocolate." (Case agents learned "chocolate" is a slang term for heroin). LOPEZ told CS-2 he was paying "25" ($25,000) for a kilogram of heroin. LOPEZ indicated he would receive 7 kilograms of heroin and was going to increase the amount of 10 kilograms of heroin by adding a cutting agent to the 7 kilograms of heroin. LOPEZ described how this process was going to increase the "profit" LOPEZ and CS-2 would see from distributing these narcotics.

22. Case agents further spoke with CS-2 regarding a more recent meeting between CS-2 and LOPEZ. CS-2 stated they learned and believed LOPEZ's sister (Samantha WEBSTER) was California waiting for word from LOPEZ that he had sold the 10 pounds of crystal methamphetamine and could drive the next shipment of narcotics back to Wisconsin.

23. CS-2 stated CS-2 had observed a white Dodge Challenger near the area of LOPEZ's residence. The vehicle displayed California license plate 8JBK998. A search of the California Department of Transportation revealed the following information: 8JBK998, CA/Auto

8

Registration, VIN: 2C3CDZBT1HH548937. 2017 Dodge BTM, 2-Door The registered owner was listed as Pedro MENDOZA, Jr, DOB: 06-28-1993[6], 450 E. 4th St, Apt. 432, Santa Ana, CA 92701.

24. TFO Busche obtained a California Department Transportation photograph of MENDOZA, Jr, and displayed this photograph to CS-2 who positively identified this subject as "Pedro". Based on the conversation the CS-2 had with LOPEZ and the context in which LOPEZ referenced and talked about Pedro, TFO Busche believed MENDOZA Jr. is LOPEZ's narcotics source of supply to include heroin, cocaine and methenamine.

25. TFO Busche conducted a search of a law enforcement database of MENDOZA Jr and the address of 450 E. 4th St, Apt. 432 in Santa Ana, California. TFO Busche found an individual named Pedro MENDOZA, DOB 07-24-1971 as well as a female named Maria LUGO, DOB 05-18-1971.

26. TFO Busche conducted a search of the additional law enforcement databases and found Pedro MENDOZA-LUGO. In this law enforcement database entry, MENDOZA-LUGO had an address at 1504 E. Birch Street, Anaheim, CA.

27. A North Central HIDTA, Investigative Support Center Intelligence Analyst conducted a search of telephone toll records which revealed LOPEZ had incoming and outgoing phone calls to the phone number **(949) 299-6039**, ("**Target Cell Phone B**"), a number identified as being utilized by MENDOZA, Jr. TFO Busche checked the number in WhatsApp and observed the number had been registered to the WhatsApp application. In the contact ID photo of that WhatsApp account, TFO Busche observed a white Dodge Challenger and a red Dodge pickup truck parked in the driveway in front of a residence. The numbers "1504" were displayed on the

---

[6] MENDOZA Jr has prior arrests for Taking an Owner's Vehicle without Consent.

9

left side of the garage roof. TFO Busche conducted a Google search for that address and when TFO Busche observed the "street view" image of Google maps the appearance of the residence was the same as that depicted in the contact ID for MENDOZA Jr's WhatsApp account

28. Based on the aforementioned information, TFO Busche believed Pedro MENDOZA-LUGO and Pedro MENDOZA Jr. are likely related and more specifically, TFO Busche believed they are father and son.

29. MENDOZA-LUGO was previously indicted in case R1-03-0327 for the possession/transportation of 4 pounds of methamphetamine. In 2004, MENDOZA-LUGO was convicted of conspiracy, transportation and possession of methamphetamine for sale. He was sentenced to 4 years in prison. MENDOZA-LUGO was also arrested in 2009 for Conspiracy to distribute marijuana in Lawrenceville GA (case G3-09-0034).

30. On May 29th, 2019, case agents met with a CS-2 at a predetermined meeting location. The day prior to meeting with CS-2, CS-2 informed case agents CS-2 contacted a subject CS-2 I knew as "Chino" and arranged to purchase a quantity of methamphetamine from "Chino" the following day. CS-2 informed case agents when CS-2 spoke with "Chino" the CI was told they would meet in the area of S. 30th Street and W. Lincoln Avenue.

31. Case agents searched CS-2 at the predetermined meeting location for any weapons, US currency and controlled substances with negative results. Case agents also searched the vehicle operated by CS-2 for weapons, US currency and controlled substances with negative results. Once CS-2 and CS-2's vehicle was searched, case agents had CS-2 contact "Chino" through text messaging, to confirm the meeting location to conduct the controlled buy of methamphetamine. CS-2 was equipped with a covert audio only transmitter/recorder as well as a covert video recorder.

10

Case agents elected to depart the predetermined meeting location and began traveling to the buy location.

32. While enroute to the controlled buy location, DEA Group 63 Task Force Officer (TFO) Aaron Busche overheard CS-2 receive a FaceTime call. During the conversation, TFO Busche overheard CS-2 say, "He's calling me now." (CS-2 later told TFO Busche during the FaceTime conversation with LOPEZ, CS-2 received a FaceTime call from "Chino". CS-2 ended the conversation with LOPEZ and spoke with "Chino." "Chino" told CS-2 his phone died, and he attached it to a charger. "Chino" and CS-2 discussed a meeting location and decided on meeting near the area of S. 30th Street and W. Lincoln Avenue. "Chino" told CS-2 to meet at the "gas station."

33. Surveillance units were deployed in the area and indicated there was a gas station on the southeast corner of the intersection of S. 30th Street and W. Lincoln Avenue. CS-2 was directed to park in the parking lot of the gas station. At approximately 11:00 a.m., TFO Evelyn Lazo observed a "lifted" white Chevrolet Silverado pick-up truck enter the gas station parking lot. The vehicle displayed Tennessee dealer registration plate 34404D. TFO Lazo observed a Hispanic male exit the driver door of the Silverado. The Hispanic male was carrying a black "convenience store" bag and was wearing a black and white striped shirt and black pants. TFO Lazo observed this subject walk to CS-2's vehicle and enter the passenger door. (CS-2 would later confirm the subject as the subject CS-2 knew as "Chino"). Approximately one minute later "Chino" exited the passenger side of the CS-2's vehicle and returned to the driver door of the pick-up truck.

34. City of Waukesha Investigative Specialist (SPC) Tim Filter and TFO Busche met with CS-2 at a pre-determined meeting location. SPC Filter searched CS-2 for any weapons, controlled substances and US Currency with negative results. TFO Busche retrieved the covert

11

audio and video recording devices as well as a black "convenience store bag" from the front passenger seat of the CS-2's vehicle which contained 454 grams of methamphetamine.
TFO Busche, as witnessed by TFO Plennes, subjected a sample of methamphetamine to the Nark II, #01 Marquis Reagent test and received a positive result for the presence of methamphetamine.

35. A review of **AT&T** telephone records for **(949) 299-6039, ("Target Cell Phone B")** revealed that the phone is subscribed to "Joahn Mendoza" at "450 E. 4th St, Apartment 432, Santa Ana, CA 92701". The account has a registered email address of jmendoza24_12@yahoo.com".

36. Telephone tolls analysis of the phone number **(949) 299-6039, ("Target Cell Phone B")** were completed which showed MENDOZA had 20 contacts with (414) 306-2769, LOPEZ. Of the 20 calls between MENDOZA and LOPEZ, 11 calls were completed, 10 were less than 1 minute in duration. Case agents are aware drug traffickers have short phone interaction to deter law enforcement. Case agents are aware that if MENDOZA and LOPEZ are communicating via an encrypted application similar to WhatsApp, case agents will be unable to track or monitor the communication through toll records.

37. In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several

12

of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

38. Based on my training and experience, I know that **AT&T** can collect E-911 Phase II data about the location of **Target Cell Phone B**, including by initiating a signal to determine the location of **Target Cell Phone B** on **AT&T**'s networks or with such other reference points as may be reasonably available.

39. Based on my training and experience, I know that **AT&T** can collect cell-site data about **Target Cell Phone B**.

## AUTHORIZATION REQUEST

40. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

41. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Cell Phone B** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify

13

confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

42. I further request that the Court direct **AT&T** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **AT&T**. I also request that the Court direct **AT&T** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **AT&T**'s services, including by initiating a signal to determine the location of **Target Cell Phone B** on **AT&T**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

43. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phone B** outside of daytime hours.

## ATTACHMENT A

Property to Be Searched

1. The cellular telephone assigned cell number **(949) 299-6039, ("Target Cell Phone B")** whose service provider is **AT&T**, a wireless telephone service provider headquartered in North Palm Beach, FL.

2. Information about the location of **(949) 299-6039, ("Target Cell Phone B")** that is within the possession, custody, or control of **AT&T**.

1

## ATTACHMENT B

Particular Things to be Seized

All information about the location of **(949) 299-6039, ("Target Cell Phone B")** described in Attachment A for a period of forty-five days, during all times of day and night. "Information about the location of **(949) 299-6039, ("Target Cell Phone B")** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **AT&T**, **AT&T** is required to disclose the Location Information to the government. In addition, **AT&T** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **AT&T**'s services, including by initiating a signal to determine the location of **(949) 299-6039, ("Target Cell Phone B")** on **AT&T**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).